## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>**Jared Andrew Pratt and<br>Cami Brook Pratt,**<br><br>**Debtors.** | **Bankruptcy Case<br>No. 19-40401-JMM** |

### MEMORANDUM OF DECISION

**Appearances:**

    Paul Ross, Paul, Idaho, Attorney for Debtors.

    Jeffrey Kaufman, Meridian, Idaho, Attorney for Chapter 13 Trustee.

### Introduction

Before the Court is a Motion to Modify the Confirmed Plan (the "Motion") filed by the standing chapter 13 trustee, Kathleen McCallister ("Trustee"), and debtors Jared and Cami Pratt's ("Debtors") objection to the Motion. Doc. Nos. 111 and 116. Through the Motion, Trustee seeks to modify Debtors' chapter 13 plan to increase plan payments from $1,150 per month to $1,993 per month because Debtors have enjoyed an increase in income. Debtors resist such a modification. They agree their income has gone up but assert an increase in plan payments is not feasible because their expenses have increased

MEMORANDUM OF DECISION–1

in lockstep. In response, Trustee contends these expenses are not reasonable and necessary, relying on the Internal Revenue Service's National and Local Standards as guideposts for reasonableness. Trustee also seeks to capture 75% of the net of any bonuses Debtors receive, which Debtors oppose.

The Court held an evidentiary hearing on the Motion on October 25 and November 10, 2022, where Trustee and Ms. Pratt testified. The parties submitted post-hearing briefs on November 18, 2022. Doc. Nos. 142 and 143. The Court then took the matter under advisement. Having considered the evidence and arguments made by the parties, this decision sets forth the Court's findings, conclusions, and reasons for its disposition of the Motion. Rules 7052 and 9014.[1]

## Background

Ms. Pratt works as a middle school teacher for the Minidoka County School District. She also teaches a cheer class at the high school. Mr. Pratt works as a transportation technician for the State of Idaho. Debtors live just north of Rupert, Idaho and have four children, two of whom are now adults. In April 2019, Debtors filed for chapter 13 bankruptcy. Ex. 200. When they filed for bankruptcy, Debtors held the same jobs as they do now. At the time, Debtors had three dependents, a 16-year-old son and 13- and 11-year-old daughters (who are now 20, 17, and 15 years old respectively). Debtors' pre-confirmation schedules reflected they had take-home pay of $5,345.96 per

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION–2

month and expenses of $4,195 per month, leaving them with monthly net income of $1,150.96. On February 18, 2020, Debtors' chapter 13 plan was confirmed. Doc. Nos. 30 and 84. The plan provided for 60 payments of $1,150 per month. Doc. No. 84. Debtors' plan did not pay 100% to unsecured creditors.

In April and May of 2022, Trustee received updated paystubs from Debtors reflecting an increase in Mr. and Ms. Pratt's income from when they filed for bankruptcy. Doc. Nos. 102, 103 and 109. By Trustee's math, Debtors' net income increased by $842.23 per month. Doc. No. 111. On May 25, 2022, Trustee moved to modify Debtors' plan to increase plan payments by $843 per month, beginning with the June 2022 payment. *Id*. Trustee also asserted that Mr. Pratt received a $5,000 bonus in March 2022 and requested Debtors' plan be modified to provide for turnover of 75% of the net of any bonuses they receive, including the March 2022 bonus.

On July 8, 2022, Debtors filed a supplement to their Schedule I and J largely adopting Trustee's income calculations[2] but identifying increased expenses of $835 per month. Ex. 202. Their supplemented Schedule I and J reflected monthly net income of $1,155.01—or $5 above their unmodified plan payment. *Id*. Then, on July 11, 2022, Debtors objected to Trustee's Motion, arguing that modification is not feasible. Doc. No. 116, p. 1. In their objection, Debtors take issue with the fact that Trustee does not account for increases in costs of living "due to regular inflation or the inflation occurring

---

[2] There was a $3.18 difference between the Trustee's and Debtors' net income calculation. *See* Doc. No. 111 and Ex. 202.

post-pandemic." *Id.* Debtors observed that fuel, home maintenance, and food and housekeeping supplies have all increased dramatically. *Id.* Specifically, Debtors highlighted that Mr. Pratt drives a diesel truck and works in Declo, Idaho, that diesel prices have doubled since the filing of the case, and that their medical expenses have increased due to various health issues. *Id.* Debtors conclude that their expenses appear to exceed their increased income. As to the bonus, Debtors stated Mr. Pratt works for an Idaho state agency and bonuses are not common or usual. Debtors said they "do not necessarily oppose a portion of a bonus, but not 75%." *Id.*

On August 15, 2022, Debtors supplemented their Schedule I and J to correct a scrivener's error regarding their children's genders. Ex. 203.

On October 18, 2022, Debtors filed another supplemental Schedule I and J to reduce their dependents from three to two, since their 20-year-old son moved out. Ex. 100. Their updated schedules also reflected a decrease in their mortgage expense from $875 to $840 per month, an increase in their food and housekeeping supplies expense from $1,200 to $1,250 per month, a $90 per month car insurance contribution from their 23- and 20-year-old sons, and a decrease in their net car insurance expense from $260 to $245 per month. *Id.* Their monthly net income remained at $1,155.01. *Id.* To summarize, Debtors' Schedule J expenses changed as follows from the commencement of their case in April 2019 to October 2022:

| No. | Description | April 2019 | October 2022 | Change |
|-----|-------------|------------|--------------|--------|
| Debtors' Schedule J Changes from April 2019 to October 2022 | | | | |
| 4 | Mortgage payment | $850 | $840 | (10) |
| 4c | Home maintenance, repair, and upkeep expenses | $150 | $180 | $30 |
| 6a | Electricity, heat, natural gas | $220 | $240 | $20 |
| 6b | Water, sewer, garbage collection | $45 | $45 | 0 |
| 6c | Telephone, cell phone, Internet, satellite, and cable services | $400 | $400 | 0 |
| 7 | Food and housekeeping supplies | $1,000 | $1,250 | $250 |
| 8 | Childcare and children's education costs | $150 | $200 | $50 |
| 9 | Clothing, laundry, and dry cleaning | $150 | $150 | 0 |
| 10 | Personal care products and services | $75 | $100 | $25 |
| 11 | Medical and dental expenses | $250 | $300 | $50 |
| 12 | Transportation (gas, maintenance) | $500 | $900 | $400 |
| 13 | Entertainment, clubs, recreation, newspapers, magazines, and books | $150 | $150 | $0 |
| 14 | Charitable contributions and religious donations | $30 | $30 | 0 |
| 15c | Vehicle insurance | $225 | $245* | 20 |
| | Total | $4,195 | $5,030 | $835 |

\* This is Debtors' net vehicle insurance expense.  Debtors' scheduled vehicle insurance expense is $335.

## Analysis and Disposition

Modification of a confirmed plan is governed by § 1329.  Relevant here, § 1329(a)(1) allows a confirmed plan to be modified to increase plan payments "provided the modified plan complies with the general confirmation requirements of § 1325(a)." *In re Wood*, 543 B.R. 915, 921 (Bankr. D. Idaho 2016).  Compliance with § 1325(a) includes proof of good faith and feasibility.  §§ 1325(a)(3) and (6).

"[W]hether a modification should be approved is subject to the bankruptcy judge's discretion and good judgment in reviewing the motion to modify." *In re Hall*, 442 B.R.

754, 761 (Bankr. D. Idaho 2010) (citing *Powers v. Savage (In re Powers)*, 202 B.R. 618, 622 (9th Cir. BAP 1996)).  Modification analysis under § 1329 is equitable in nature and courts look to the totality of the circumstances.  *See Hall*, 442 B.R. at 761 (citing *Max Recovery, Inc. v. Than (In re Than)*, 215 B.R. 430, 438 (9th Cir. BAP 1997)).  One such circumstance is when a debtor's income increases.  *Berkley v. Burchard (In re Berkley)*, 613 B.R. 547, 552 (9th Cir. BAP 2020) ("It is well accepted that § 1329 permits the trustee and creditors to modify the plan to capture postconfirmation increases in the debtor's income.").  In exercising their discretion, courts may also "evaluate the reasonableness of debtors' expenses and their ability to pay creditors more."  *In re Sayre*, No. 8:11-BK-17184-RCT, 2017 WL 11569064, at *4 (Bankr. M.D. Fla. July 17, 2017). In so doing, courts balance a debtor's expenses against what is fair to unsecured creditors. *See id*.  As the party seeking modification, Trustee bears the burden of showing facts sufficient to demonstrate that a plan modification is warranted.  *Wood*, 543 B.R. at 921.

Here, the Court does not question Trustee's good faith.  She is obligated to ensure debtors pay their unsecured creditors to the extent possible.  *See Sayre*, 2017 WL 11569064, at *4.  But as the proponent of modification, Trustee must prove that Debtors will be able to afford the modified payments.  As noted above, the parties agree that Debtors' income increased.  The dispute largely centers on whether certain expenses are reasonable and necessary for purposes of a plan modification.  The parties also agree the IRS National and Local Standards for monthly expenses are not controlling but may be

used as a tool to gauge the reasonableness of a debtor's expenses.[3]  The Court accepts

this, as have other Idaho Bankruptcy Courts and the Ninth Circuit Bankruptcy Appellate

Panel.  *See Wood*, 543 B.R. at 923 (citing *In re Stitt*, 403 B.R. 694, 704 (Bankr. D. Idaho

2008)); *In re Alcaraz,* No. 15-00091-TLM, 2017 WL 978982, at *4 (Bankr. D. Idaho

Mar. 13, 2017); *Sunahara v. Burchard (In re Sunahara)*, 326 B.R. 768, 781 (9th Cir.

BAP 2005).

By reference to the IRS guidelines, Trustee takes issue with Debtors': (1)

"standard [of] living expenses," (2) children's education expenses, (3) transportation

expenses, and (4) out-of-pocket medical expenses.  Doc. No. 142, p. 4.  In response,

Debtors argue these expenses are reasonable and necessary, and in fact, they were overly

conservative in calculating their budget because it does not reflect other expenses they

have incurred.   The Court will address each issue in turn.

### 1) Living expenses

IRS National Standards have been established for five categories of necessary

living expenses.  For cases filed after May 15, 2022, a household of four is allowed a

total of $1,900 per month.  Ex. 204.  This includes $1,028 for food, $85 for housekeeping

supplies, $279 for apparel and services, $96 for personal care products and services, and

$412 for miscellaneous expenses.  *Id*.  Trustee generated a table of Debtors' Schedule J

---

[3]  These standards are incorporated by §§ 1325(b)(3) and 707(b)(2)(A) and are used pre-confirmation to measure a debtor's disposable income.

expenses that she asserts fall within these categories.  The Court has reproduced the

substance of the table below:

| No. | Description | Amount | IRS Allowance | Over/(under) |
|-----|-------------|--------|---------------|--------------|
| Debtors' October 2022 Schedule J expenses and the IRS National Standard for Food, Clothing, and Other Items | | | | |
| 4c | Home maintenance, repair, and upkeep expenses | $180* | $412 | ($232) |
| 6c | Telephone, cell phone, Internet, satellite, and cable services | $400* | | $400 |
| 7 | Food and housekeeping supplies | $1,250 | $1,113 | $137 |
| 9 | Clothing, laundry, and dry cleaning | $150 | $279 | ($129) |
| 10 | Personal care products and services | $100 | $96 | $4 |
| 13 | Entertainment, clubs, recreation, newspapers, magazines, and books | $150 | | $150 |
| | Total | $2,230 | $1,900 | $330 |
| *Per Trustee these items are included in the IRS' "miscellaneous" expense category. | | | | |

Trustee contends, by reference to this table, that Debtors exceed the IRS

guidelines for these expenses by $330 per month.  Trustee asserts Debtors' living

situation is not unique, nor have they demonstrated a need to deviate from the National

Standard allowances, and accordingly their expenses in these areas are not reasonable and

necessary.  Because of this, Trustee asserts Debtors can afford to contribute more of their

income to plan payments.

While again the IRS allowances are not controlling for post-confirmation

modification, the Court finds that in arriving at the $330 per month overage, Trustee

makes two faulty assumptions.  The first is that Debtors' $180 per month expense for

MEMORANDUM OF DECISION–8

"[h]ome maintenance, repair, and upkeep," which is at paragraph 4c on Schedule J, falls under the IRS' $402 per month allowance for "miscellaneous expenses."  The Internal Revenue Manual ("IRM"), which provides guidance to IRS agents in interpreting and applying the agency's standards, and, as other courts have noted, informs the Court, explains that home maintenance and repair expenses are covered by the IRS Local Standard for housing and utilities.  IRM 5.15.1.8(5); *see, e.g., In re Carroll*, No. 12-41350-JDP, 2013 Bankr. LEXIS 3072, at *2 (Bankr. D. Idaho Apr. 15, 2013).  United State Trustee Program ("USTP") guidance documents echo the IRM on this point.  *See The Statement of the U.S. Trustee Program's Position on Legal Issues Arising Under the Chapter 13 Disposable Income Test* (stating that home "maintenance and repair"  are covered by the "housing and utilities, non-mortgage expense category" of the IRS Local Standards "and may not be counted elsewhere.").

Trustee's second faulty assumption is that all of Debtors' $400 per month expense for "telephone, cell phone, Internet, satellite, and cable services," which is listed under the "Utilities" heading at paragraph 6c of Schedule J, falls under the IRS' $402 per month "miscellaneous expense" allowance.  As with home maintenance and repair expenses, the IRM explains that "cable television, internet services, telephone and cell phone" expenses are included as allowances under the Local Standard for housing and utilities.  IRM 5.15.1.10.1.  The Court notes, however, that the relevant USTP guidance document seemingly takes a narrower view of what is includable.  It lists "basic telephone and cell phone service" as includable housing and utilities expenses.  It does not specifically list

MEMORANDUM OF DECISION–9

cable, satellite, or Internet.  *See The Statement of the U.S. Trustee Program's Position on Legal Issues Arising Under the Chapter 13 Disposable Income Test*.  The Court notes, however, this is a guidance document for calculating disposable income pre-confirmation and is not controlling.  In any event, to the extent Debtors' $400 per month expense for these services is for basic-level telephone, cellphone, and internet services (that is to say, utilities rather than premium or entertainment-type expenses) the Court will apply them to the IRS Local Standard for housing and utilities.  For the purposes of Trustee's Motion and because these expenses are not broken out at paragraph 6c of Schedule J, the Court will apply $200 of this amount to the housing and utilities category and $200 to the miscellaneous personal expense category.

Recategorizing these expenses as such reduces Trustee's over/under calculation for Debtors' expenses by reference to the IRS National Standard for food, clothing, and other items from $330 over to $50 under.  The Court will now turn to Debtors' food and housekeeping supplies expense, which exceeds the IRS guidelines for these subcategories by $137 per month.  Trustee takes issue that Debtors' food and housekeeping expense increased $250 per month during the three years since Debtors filed their bankruptcy petition despite their household size decreasing from five to four individuals.  Trustee understands the inflationary climate, but asserts this increase is not reasonable.  Per Ms. Pratt, Debtors' food budget is an estimate based off the United States Department of Agriculture's Food Plans for August 2022 rather than Debtors' actual expenditures.  Ex. 104.  The USDA's Moderate-Cost food plan allows for $1,271.40 per month in food

MEMORANDUM OF DECISION–10

costs for a family of four, while its Low-Cost food plan allows for $1,043.33 per month.

*Id.* Ms. Pratt testified the $1,250 figure, which she based off the Moderate-Cost plan, is reasonable due to the dietary needs of her and her husband. She testified they require special diets for various health conditions including diabetes and lactose intolerance. In addition, Debtors assert the $1,250 per month figure absorbed the approximately $60 per month they spend on dog food for their 17-year old's service dog. When asked why she did not document the household's actual food costs, Ms. Pratt indicated it would be "difficult to do" because (i) at some stores the Debtors buy groceries she would not be able to discern the food items from the non-food items without looking at the receipts, (ii) she does not always keep the receipts, and (iii) she does not have the time to go line-by-line through the receipts. The Court accepts that food costs have gone up, and that it is not necessarily unreasonable for Debtors' food bill to increase despite the size of their household decreasing. The Court would prefer to see Debtors' actual food expenses, but the Court does not find Trustee has demonstrated Debtors' food and housekeeping expenses to be excessive for their household.

Finding Debtors' home maintenance and some of their telephone, cell phone, Internet, satellite, and cable expenses fall under the IRS Local Standard for housing and utilities, the Court will briefly turn to them. For a family of four in Minidoka County, Idaho, the IRS guidelines provide an allowance of $679 per month for "housing and utilities; non-mortgage expenses" and $965 per month for "housing and utilities; mortgage/rent expense." Ex. 204. Here, Debtors' mortgage expense is $840 per month

MEMORANDUM OF DECISION–11

or $125 under the covered amount.  Factoring in half of Debtors' telecommunication utilities and the $180 per month expense for home maintenance and repairs, Debtors' non-mortgage housing and utilities expenses are $665 per month, or $14 below the allowance.

| No. | Description | Amount | IRS Allowance | Over/(under) |
|-----|-------------|--------|---------------|--------------|
| Debtors' Schedule J expenses and the IRS Local Standard for Housing and Utilities ||||| 
| 4 | Rental or homeownership expenses for residence | $840 | $965 | ($125) |
| 4a | Real estate taxes | | | |
| 4b | Property or homeowner's insurance | | | |
| 4c | Home maintenance, repair, and upkeep expenses | $180 | $679 | ($14) |
| 6 | Utilities | | | |
| 6a | Electricity, heat, natural gas | $240 | | |
| 6b | Water, sewer, garbage collection | $45 | | |
| 6c | Telephone, cell phone, Internet, satellite, and cable services | $200 of $400* | | |
| | Total | $1,505 | $1,644 | ($139) |

*The Court is apportioning half of this amount to the IRS Local Standard for "housing and utilities, non-mortgage expenses."

In sum, as summarized in the table above, Debtors are $139 per month under the IRS Local Standard for housing and utilities expenses.  Since in the aggregate, Debtors' living expenses are below the IRS National and Local standards, the Court finds Trustee's critique of Debtors' budget wanting.  Trustee has not met her burden that Debtors' increased expenses in these areas are unreasonable or unnecessary.

MEMORANDUM OF DECISION–12

### 2) Education costs of Debtors' children

Trustee next takes issue with the $200 per month in education costs of Debtors' children.  Ex. 202 and 203 at ¶ 8.  This figure represents school expenses for Debtors' 17- and 15-year-old daughters.  It includes the 17-year old's expenses for choir and cheerleading and the 15-year old's expenses for volleyball, orchestra, and art club at Minico High School.  Trustee argues these are elective and extracurricular activities and "therefore are not necessarily incurred for [Debtors'] children to attend public high school."  Doc. No. 142, p. 7.  Trustee asserts these expenses should be included as a recreation expense "already included and provided for under the Standard Living Allowance," (presumably the miscellaneous expense category).  *Id.*  In Trustee's view, Debtors' evidence only reflects the purchase of an activity card as being "necessarily incurred for their children to attend high school."  *Id.*  To account for incidentals "like a yearbook and/or class pictures as well as one of the two children finishing high school in the Spring," Trustee accepts $50 per month as a necessary expense.  *Id.*  Trustee concludes this frees up $150 per month for Debtors to increase their plan payments.

In contrast, Debtors break out their annual children's education costs as follows: $120 for registration of both children, $20 for laptop protection, $90 for Advanced Placement textbook(s), $800 for cheerleading, $400 for choir, $200 for orchestra, $200 for volleyball, and $480 for violin rental.  These total $2,310 annually, which is approximately Debtors' education budget.  In support of some of these expenditures Debtors offered Exhibits 110 and 111, which are "Customer Ledgers" for the 17- and 15-

MEMORANDUM OF DECISION–13

year-old at Minico High School and Exhibit 108, which is a violin rental receipt. Ms.

Pratt also identified a choir trip to Seattle, which would be $800 for their daughter, plus

$800 for Ms. Pratt as a chaperone due to the daughter's medical needs, for a total of

$1,600. Ex. 108. Factoring in this trip, the expenses total $3,910 or $325.83 per month.

Ms. Pratt identified the children engaged in fundraising to offset some of these expenses

of close to $900, which would reduce the yearly expense to $3,032 or $252.67 per month.

Debtors concede that some of these expenses could be viewed as unnecessary,

unreasonable, or inappropriate, but that sports and extracurricular activities are part of the

school experience and that Debtors' children should not be prohibited from some

extracurricular opportunities because of their parents' bankruptcy.

On these facts, the Court does not find Debtors' $200 per month expense for their

children's education costs to be excessive. Orchestra, choir, volleyball, and cheerleading

are typical high school activities and Debtors' children have engaged in fundraising

activities to help offset some of the costs. While the Court agrees that Debtors'

unsecured creditors should not necessarily be footing the bill for the choir trip to Seattle,

even if the Court excludes this sum, Debtors' monthly education budget remains at

approximately the $200 per month figure they included in their budget. Finally, in

balancing this expense in Debtors' favor the Court notes that Debtors are $189 per month

under the IRS National and Local Standards for allowable living expenses.

### 3) Debtors' transportation expenses

Trustee next argues Debtors' transportation expenses are excessive. These expenses total $1,145 per month, comprised of $900 per month for fuel and maintenance and $245 per month in net car insurance expenditures. Ex. 100. Trustee notes this equates to a $420 per month increase from when Debtors filed for bankruptcy. At that time, Debtors were spending $500 per month for fuel and maintenance and $225 per month for car insurance, or $725 per month total. Ex. 201. Back then, Debtors were insuring their then 16-year-old son, but not their two daughters.

Trustee relies on the IRS Local Standard for transportation expenses, which for the West Region allows operating costs of $285 per car, up to $570 per month. Ex. 204. Per the IRM, operating costs include "maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls." IRM 5.15.18.8(5)(b). Trustee asserts Debtors' transportation expenses are not reasonable for their household and the IRS standard of $570 per month is a reasonable figure, which would allow Debtors to increase their plan payments by $575 per month. The Court will first address Debtors' car insurance costs.

*(a) Debtors' car insurance expense*

Debtors pay to insure six vehicles: a 2009 Saturn Aura for Ms. Pratt, a 2005 GMC Sierra for Mr. Pratt, a 2008 Ford Escape of the 17-year-old, a 1995 Chevy Corsica for the 15-year-old, a 2012 Subaru Outback for the 23-year-old, and a 2004 VW Jetta for the 20-year-old. Ex. 206. Debtors' latest Schedule I reflects their 23- and 20-year-old sons reimburse them $90 per month for the insurance for the two vehicles they drive. Ex. 100.

MEMORANDUM OF DECISION–15

This leaves Debtors paying to insure four vehicles. Debtors' car insurance costs are documented at Exhibit 206, which reflect Debtors' annual premium effective as of September 2022. The annual premium for the six cars is $3,598 plus $22 for accidental death coverage, which works out to be $301.67 per month. Factoring in the $90 per month reimbursement,[4] the Court calculates Debtors' actual insurance costs are $211.67 per month, or $33 less than the net amount they budgeted.

Trustee asserts that Debtors do not need to insure separate vehicles for their 17 and 15-year-olds, noting that while it may be convenient for Debtors' children to use these cars to drive to school, it is not necessary. Trustee points out that a school bus system is available to the children and that Ms. Pratt can drop them off when she drives to the high school to teach cheer class first period. Moreover, Trustee asserts that the middle school Ms. Pratt works at for the rest of the day finishes its classes before the high school, so presumably she could pick up the children as well.

Debtors counter that it is not quite that simple. The 17-year old's choir class is a "zero hour" class, which starts at 6:30 a.m. The 17-year-old also requires the assistance of a service dog. All this and a medical condition preclude her from taking the bus and make carpooling with her a challenge. Ms. Pratt also testified both children generally have after-school activities, which means they cannot take the bus at the end of the school day. Ms. Pratt testified Debtors do carpool when their schedules allow and that they

---

[4] The annual premium for the vehicles the 23- and 20-year-old are listed as driving is $1,281 per year, or $106.75 per month. Ex. 206. Accordingly, Debtors are subsidizing approximately $17 per month of their premium.

MEMORANDUM OF DECISION–16

mainly use two cars for her and the daughters to go to work and school.  Lastly, Debtors identify that while removing the two vehicles the 17-year-old and 15-year-old drive from their policy would reduce their car insurance expense by $108.58 per month, whether they insure the vehicles or not, some amount of car insurance would need to be provided for their teenage drivers.

While the Court is not convinced that now paying to insure multiple teenage drivers is a cost that should be subsidized by Debtors' unsecured creditors, Debtors' car insurance expense has actually decreased since they filed for bankruptcy despite having an additional teenage driver.  Additionally, the magnitude of Debtors' monthly insurance expense is relatively low despite them paying to insure four vehicles.  Further, the Court finds Debtors have carried their defensive burden as to the reasonableness of the 17-year old's car insurance costs and whether Debtors insure the 15-year old's vehicle or not, the Court agrees that she should not necessarily be driving around uninsured.  Accordingly, the Court does not find that Trustee has demonstrated Debtors' car insurance expense is unreasonable.  The Court does, however, find that Debtors' plan payment should be increased by the $33 per month difference between Debtors' actual car insurance expense and the amount they budgeted and the $17 difference between the 23- and 20-year old's monthly insurance costs and the amount they reimburse Debtors.

*(b) Debtors' fuel and maintenance expense*

The Court next turns to Debtors' fuel and maintenance expense which Debtors budgeted at $900 per month.  Ms. Pratt testified that most of this expense is for fuel.

MEMORANDUM OF DECISION–17

Debtors offered documentation for their fuel expenses for the 8-month period from December 6, 2021 to August 5, 2022. Exhibit 103. The fuel costs for this period are $6,714.97, which work out to approximately $840 per month. The exhibit, which Debtors generated from a bank statement, reflects charges on a Maverik gas station rewards card and point of sale transactions at various gas stations that Debtors frequent, including Maverik. *Id.* Ms. Pratt testified that Debtors also spend about $50 per month on routine maintenance. She stated the $900 per month figure may be on the low end for all their fuel and maintenance costs. Specifically, she testified to registration fees of about $25 per month and tire replacement costs of $100 per month.[5] Additionally, she noted Debtors have deferred "a bunch of maintenance" on the vehicles to stay on budget. She explained because their cars are all older, they require extra care. Lastly, Debtors highlighted that Mr. Pratt's 2005 GMC Sierra runs on diesel fuel, which is more expensive, but the truck is necessary for Mr. Pratt's work. Debtors argue that fuel costs have almost doubled but they did not double their fuel budget.

Trustee questions the veracity of whether Debtors indeed spend around $840 per month in fuel purchases,[6] but asserts such amount is excessive for Debtors' household.

---

[5]  In their post-hearing brief, Debtors asserted Ms. Pratt's testimony shows that Debtors' transportation expenses on their Schedule J were about $253 per month too low. Debtors asserted that Ms. Pratt "expected another set of tires each year of about $1,200 ($100 per month), ongoing oil changes of about $630 per year ($53 per month), and another $100 per month in just basic car repairs and upkeep such as filters, wipers, and such." Doc. No. 143, p. 3. The Court notes that Ms. Pratt did not testify to ongoing oil changes of $53 per month or $100 per month in basic car repairs.

[6]  Trustee argued at the evidentiary hearing that Debtors' fuel expenditures exhibit does not identify who is making the purchases or whether all the point-of-sale transactions are just for fuel. Ms. Pratt testified

MEMORANDUM OF DECISION–18

Trustee cites the IRS allowance of $570 per month, which is to provide for insurance, maintenance, and fuel, and that Debtors' transportation expenses of $1,145 per month are nearly double this amount.  Trustee asserts that Debtors "do not explain why their fuel cost is so high or why they purchase fuel so frequently."  Doc. No. 142, p. 8.  At the evidentiary hearing, Trustee identified, per Debtors' Exhibit 103, that they went to gas stations ten times in December 2021, eleven times in January 2022, nineteen times in February 2022, thirteen times in March 2022, fifteen times in April 2022, seventeen times in May 2022, eighteen times in June 2022, sixteen times in July 2022, and three times in the abbreviated month of August 2022.  Trustee acknowledges that while Debtors may live in a rural area, Ms. Pratt's commute from just north of Rupert to the high school and middle school in Rupert is not lengthy.  Trustee identifies there was insufficient testimony to determine how far Mr. Pratt drives, other than he drives to Declo, which is about twenty miles roundtrip from Rupert.  In sum, Trustee asserts Debtors do not have dissimilar driving distances compared to other similarly situated chapter 13 debtors.

As observed by Debtors, Trustee's concern comes down "to whether the household should be paying for four vehicles to be driving around at the expense of unsecured creditors" who are not being paid in full.  Doc. No. 143, p. 8.  Here, the Court finds Mr. and Ms. Pratt certainly need to drive to work, and the 17-year old's car expenses are reasonably necessary.  However, paying for the fuel and maintenance of a

---

she, Mr. Pratt, and the 17- and 15-year-olds may use the card, and she assumed the point-of-sale transactions were for fuel based on the amount.

fourth vehicle is not reasonable and necessary under these facts.  The Court accepts that fuel costs may have gone up but having a fourth car on the road certainly contributes to Debtors' sizable fuel and maintenance expense.  The Court will therefore reduce Debtors' fuel and maintenance expense of $900 by 20%.[7]  In arriving at the 20% figure, the Court (i) relies on Ms. Pratt's testimony that Debtors mainly use two cars for Ms. Pratt and the children to attend school and work, (ii) that Mr. Pratt's diesel truck requires more expensive fuel, and (iii) that in some respects Debtors' actual transportation expenses may be understated.  Lastly, the Court considers that Debtors never explained why they expend so much on fuel given their relatively modest commutes.  This frees up $180 per month to be contributed to Debtors' plan payments.

### 4) Debtors' out-of-pocket medical expenses

At the evidentiary hearing, Trustee initially conceded she did not take issue with Debtors' $300 per month medical and dental expenses or apparently any offset stemming from the $99.40 per month health savings account ("HSA") contribution Ms. Pratt was receiving from her employer.  Trustee changed course after discussion of Ms. Pratt's August 25 and September 23, 2022 paystubs.[8]  They show that Ms. Pratt's employer increased its contribution to her "Health Equity HSA" by $121.55 per month from the August 25, 2022 paystub to the September 23, 2022 paystub.  Ms. Pratt testified the HSA

---

[7] The Court notes that Debtors' fuel costs are not broken out by vehicle nor was any testimony offered concerning how much each of the cars are driven.

[8] These documents were filed at Doc. No. 137 on October 24, 2022 (that is, after Debtors' last updated supplemental Schedule I and J, and a day before Day 1 of the evidentiary hearing).

contribution depends on the contract for the year with her employer and that it went up

starting with her September 23, 2022 paystub. According to Trustee, since Ms. Pratt did

not testify the increased HSA contribution was offset by increased medical expenses and

Debtors' budgeted medical and dental expenses remained at $300 per month, Debtors'

plan payments should be increased by this amount. The Court agrees and finds Debtors'

dental and medical expenses are offset by the increased HSA contribution, which frees up

additional disposable income. Because of this, the Court determines that Debtors' plan

payments can be increased by $121 per month going forward.[9]

### 5) Ms. Pratt's increased tax withholding and Debtors' other expenses

The Court will now address Ms. Pratt's increased federal tax withholding and a

few other expenses identified by Ms. Pratt at the hearing that were not included in

Debtors' supplemental Schedule Js. On October 24, 2022, Debtors filed updated

paystubs for August and September 2022. Doc. Nos. 136 and 137. Ms. Pratt's

September 23, 2022 paystub shows that her monthly "tax, Medicare, and Social Security

deductions" increased from the $513.65 listed on Debtors' supplemental Schedule Is to

$829.40, an increase of $315.75. Exs. 100 and 202; Doc. No. 137. As to the change, Ms.

Pratt testified when Debtors filed their 2021 federal income tax return, they "had to pay

almost $1,500" in taxes. Per Ms. Pratt, she then noticed her employer had not been

---

[9] Debtors assert in their post-hearing brief that "Ms. Pratt had limited testimony regarding medical expenses due to time constraints…." Doc. No. 143, p. 4. The Court notes that counsel for Debtors had the opportunity to inquire of Ms. Pratt if Debtors' expected or actual medical expenses subsumed the increased HSA contribution after the Trustee questioned Ms. Pratt on this issue. He did not do so.

withholding the correct amount of tax from her paychecks, so she corrected the amount

withheld so Debtors would not owe taxes and might get a small refund going forward.

She noted she was not sure what the net change was from her previous paystubs.  But

when asked if the net amount went down $315, she verified that was correct.  She

affirmed that Debtors' latest supplemental Schedule I, Ex. 100, needed to be amended to

account for that.

Ms. Pratt also testified to roughly $900 per year in continuing education expenses,

which were not included on any of Debtors' supplemented schedules.  She explained she

is still trying to get a teaching certificate and this approximately $75 per month expense

is for licensing.  Ms. Pratt also testified to tax preparation costs which Debtors had to pay

out of pocket because they owed taxes.  Ms. Pratt did not testify to the amount of their tax

preparation costs.  This expense, along with the federal income tax Debtors owed for

2021, was not listed on Debtors' supplemental Schedule Js.[10]

Trustee has not offered a viewpoint on how Debtors' increased federal tax

withholding, continuing education expenses, or tax expenses might affect their ability to

---

[10]  Ms. Pratt also testified Debtors use a wood burning stove to heat their home, the cost of which is not
reflected in their Schedule Js as a utility expense.  She testified they typically use six cords of wood per
winter.  Sometimes they cut it themselves, which requires expenditures of gas and oil for the chain saw,
trips to get the wood, and the purchase of permits.  She also noted sometimes they buy the wood, which is
$250 per cord.  She testified this past year they cut their own wood.  In Debtors' post-hearing brief,
Debtors say the electric bill "does not include the estimated 6 cord of wood at $250 per cord purchased
for heating each year, or about $125/month."  Doc. No. 143, p. 3.  This mischaracterizes Ms. Pratt's
testimony.  Though, if Ms. Pratt's testimony is to be credited, it appears Debtors may have increased costs
not expressly incorporated in their utilities budget line item.  In any event, Trustee did not explicitly take
issue with Debtors' utilities expense nor is it clear how much Debtors spent to obtain firewood this past
year.

MEMORANDUM OF DECISION–22

afford the requested increased plan payments.  Nor does the Court find it has a sufficient record to discern how they impact Debtors' ability to afford a higher plan payment.  As to Ms. Pratt's updated paystubs, they were filed the day before the October 25, 2022 evidentiary hearing and are not part of the evidentiary record, nor was sufficient testimony offered concerning whether the increased $315.75 per month deduction will be the new normal going forward or how it will impact Debtors' federal tax refund.[11] Though the September 23, 2022 paystub presumably was received about a month before Debtors' October 18, 2022 supplemental Schedule I was filed, the schedule does not reflect the updated withholding.  As to Ms. Pratt's continuing education expenses, § 1325(b)(3)'s disposable income test allows debtors to exclude education expenses that are required as a condition of their job from disposable income for the purposes of plan confirmation.  Here, while it appears this expenditure may be that type of expense, and thus may be relevant to the reasonableness of Debtors' expenses, it is unclear from Ms. Pratt's testimony whether it indeed is.  Similarly, nothing in the evidentiary record documents this expense.  The same is true of Debtors' tax preparation costs and tax bill. Accordingly, the Court will not consider them for the purposes of Trustee's Motion.

---

[11]  Ms. Pratt's August 25, 2022 paystub reflects her tax, Medicare, and Social Security deductions were $460.53, or $53.12 less than her updated Schedule I.  Absent from this paystub is the $365.61 deduction for "Federal Withholding Income Tax" which is on the September 23, 2022 paystub.  However, the $365.61 deduction for "Federal Withholding Tax" apparently was not a new deduction, since Ms. Pratt's paystub reflects the year-to-date amount of this deduction category was over $2,000.

MEMORANDUM OF DECISION–23

6) **Mr. Pratt's bonus**

Lastly, Trustee argues that Debtors' plan should be modified to provide turnover of 75% of the net of any bonuses Debtors receive.  Trustee asserts that in March 2022, Mr. Pratt received a $5,000 bonus and surmises that Mr. Pratt may now be receiving periodic bonuses.  Trustee asserts the receipt of such was not contemplated by Debtors' confirmed plan, and such income is additional disposable income that must be contributed to the plan.  In turn, Debtors cite the res judicata effect of the confirmed plan and argue that because "the Plan did not provide for turnover of bonuses, and none were anticipated to be written into that Plan or Confirmation Order," such bonuses are outside the reach of Trustee.  Doc. No. 142, p. 9.

Debtors further argue "there is no evidence in the record that Mr. Pratt received a bonus, the size of the bonus, whether the income is in fact a bonus, the nature of the bonus, whether is it linked to income, and more." *Id.*  Because of this and res judicata, Debtors argue Trustee has failed to meet her burden that "bonuses exist, are income, or that another bonus is likely to be received," and the Court lacks the record on which to make a finding regarding bonuses.  *Id.*

As to Debtors' first point, the Ninth Circuit Bankruptcy Appellate Panel has repeatedly held that the res judicata effect of a confirmed plan does not apply to plan modifications.  *Skelton v. Morris (In re Morris)*, No. BAP SC-11-1240-KIMKH, 2011 WL 7145880, at *6 (9th Cir. BAP Dec. 23, 2011) ("Res judicata does not act as a bar to modify a plan under § 1329(a)."); *Mattson v. Howe (In re Mattson)*, 468 B.R. 361, 368-

MEMORANDUM OF DECISION–24

69 (9th Cir. BAP 2012) (citing *Powers*, 202 B.R. at 622 ("Modification pursuant to §

1329 provides a mechanism to change the binding effect of § 1327.")); *Max Recovery*,

215 B.R. at 435; *McDonald v. Burgie (In re Burgie)*, 239 B.R. 406, 409 (9th Cir. BAP

1999).  Nor, as Debtors acknowledge, did Trustee and Debtors contemplate Debtors

would receive bonuses. Accordingly, Trustee seeking to modify Debtors' plan to include

these funds is neither precluded nor improper.  *Skelton*, 2011 WL 7145880 at *8

("Income substitutes, such as bonuses, not captured in a debtor's plan payments may be

included in a modified plan."); *see also Hall*, 442 B.R. at 754 ("The primary factor in

determining whether to include a lump sum payment in a chapter 13 modification is not

the payment's lump sum nature, but rather the payment's purpose.  If a payment was

intended to be income … the payment may be included in a modified plan." (internal

citations omitted)).

  However, as to Debtors' second point, the Court agrees to an extent.  Mr. Pratt's

bonus was not addressed at the hearing nor was any evidence offered or admitted

concerning the bonus.  The Court is aware that Mr. Pratt's March 18, 2022 paystub

reflects additional earnings in the amount of $5,000 for a "REN BON."  Doc. No. 109.

Presumably, this is what Trustee is referring to by her allegation that Mr. Pratt received a

$5,000 bonus in March 2022.  The Court may take judicial notice that this document was

filed, but not necessarily the truth of its contents.  *See Elsaesser v. Hopper (In re

Hopper)*, No. AP 20-07008-JMM, 2021 WL 5343915, at *2 (Bankr. D. Idaho Nov. 16,

2021) (discussing the judicial notice standard).  Certainly, Debtors appear to concede that

MEMORANDUM OF DECISION–25

Mr. Pratt received a bonus, as their objection to Trustee's Motion states that Debtors did "not necessarily oppose [turning over] a portion of a bonus, but not 75%." Doc. No. 116, p. 1. In any event, the Court finds Trustee has not carried her burden to modify Debtors' plan to include such funds. Absent more information about the funds and admissible evidence that Mr. Pratt received such a bonus, the Court will not order Debtors to turnover these funds. The Court denies Trustee's Motion as to this point.

### Conclusion

In conclusion, Trustee's Motion to Modify the Confirmed Plan will be granted in part. The Court finds it is appropriate to modify Debtors' chapter 13 plan to increase plan payments by $351 per month commencing with Debtors' November 2022 plan payment and continuing for the remaining term of Debtors' plan.[12] The $351 per month increase comes from $50 in car insurance expenses and $180 in fuel and maintenance expenses the Court found to be excessive and $121 from the increased HSA contribution by Ms. Pratt's employer.

---

[12] The Court recognizes that Trustee's Motion requested an increase in plan payments starting with Debtors' June 2022 plan payment. In modifying Debtors' plan payment as of November 2022, the Court notes that Trustee and Debtors both relied on Debtors' expenses and reduction in dependents from Debtors' October 18, 2022 supplemental Schedule J, the increased HSA contribution reflected on Ms. Pratt's September 23, 2022 paystub, and Debtors' car insurance premiums for "08/30/2022 until 08/30/2023." *See* Exs. 100 and 206. Further, the evidentiary hearing was conducted in October 2022 and concluded on November 10, 2022.

MEMORANDUM OF DECISION–26

The parties may revisit Debtors' bonus(es), increased tax withholdings, tax expenditures, and continuing education expenses by a new motion to modify should they wish.

A separate order will be entered.



DATED:  January 23, 2023

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION–27